United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CHRISTINA DOTO,

          Plaintiff,

    v.

NANCY A BERRYHILL,

          Defendant.

Case No.17-cv-01120-VKD

**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 20, 22

      Plaintiff Christina Doto appeals a final decision by defendant Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act ("Act"). In 2012, Ms. Doto was diagnosed with lipedema, which the record indicates is a progressive disease involving congenital fatty enlargement of the legs and less frequently the arms that is unaffected by diet and involves abnormal lymphatic drainage from the tissues. She was also diagnosed with hypermobility joint disorder and obesity. The Administrative Law Judge ("ALJ") was presented with the question whether Ms. Doto was disabled, within the meaning of the Act, before December 31, 2012, her date last insured.

      The parties have filed cross-motions for summary judgment, and the matter was submitted without oral argument. Upon consideration of the moving and responding papers, the relevant evidence of record, and for the reasons set forth below, Ms. Doto's motion for summary judgment is granted in part and denied in part, the Commissioner's cross-motion for summary judgment is granted in part and denied in part, and this matter is remanded for further proceedings consistent

with this order.[1]

## I.      STANDARD FOR DETERMINING DISABILITY

A claimant is considered disabled under the Act if she meets two requirements.  First, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  Second, the impairment must be so severe that a claimant is unable to do previous work, and cannot "engage in any other kind of substantial gainful work which exists in the national economy," considering the claimant's age, education, and work experience.  *Id.*, § 423(d)(2)(A).

In determining whether a claimant has a disability within the meaning of the Act, an ALJ follows a five-step sequential analysis:

At step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If so, the claimant is not disabled.  If not, the analysis proceeds to step two.

At step two, the ALJ assesses the medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  *Id.* § 404.1520(c).  If the claimant has a severe medically determinable physical or mental impairment that meets the duration requirements in 20 C.F.R. § 404.1509,[2] or a combination of impairments that is severe and meets the duration requirement, she is disabled.  *Id.* § 404.1520(a)(4)(ii).  Otherwise, the evaluation proceeds to step three.

At step three, the ALJ determines whether the claimant's impairments or combination of impairments meets or medically equals the requirements of the Commissioner's Listing of

---

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73.
[2] Section 404.1509 of the Code of Federal Regulations provides, "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.  We call this the duration requirement."

1  Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). If so, a conclusive presumption of disability

2  applies. If not, the analysis proceeds to step four.

3      At step four, the ALJ determines whether the claimant has the residual functional capacity

4  ("RFC") to perform her past work despite her limitations. 20 C.F.R. § 404.1520(a)(4)(iv). If the

5  claimant can still perform past work, then she is not disabled. If the claimant cannot perform her

6  past work, then the evaluation proceeds to step five.

7      At the fifth and final step, the ALJ must determine whether the claimant can make an

8  adjustment to other work, considering the claimant's RFC, age, education, and work experience.

9  20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled.

10      The claimant bears the burden of proof at steps one through four. The Commissioner has

11  the burden at step five. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

12  **II.    BACKGROUND**

13      Ms. Doto was born in 1972 and was 43 years old at the time the ALJ rendered the decision

14  under consideration here. She earned a GED in 1997 and worked as a medical assistant, nurse,

15  afterschool teacher, and customer service representative. AR[3] 171. She last worked in August

16  2010 as an account manager. *Id*.

17      In June 2012, Ms. Doto was diagnosed with lipedema, which, as noted above, is a

18  progressive disease involving congenital fatty enlargement of the legs and sometimes the arms that

19  is unaffected by caloric restriction and involves abnormal lymphatic drainage from the tissues.

20  *See, e.g.* AR 561. Ms. Doto applied for disability benefits on February 14, 2014, alleging that she

21  was unable to work as of August 1, 2010 due to a number of conditions, including lipedema,

22  morbid obesity, hypothyroidism, hypertension, and chronic pain. AR 169-70. She last met the

23  insured status requirements of the Act on December 31, 2012. Thus, Ms. Doto had the burden to

24  prove that she was either permanently disabled or subject to a condition which became so severe

25  as to disable her prior to December 31, 2012 when her insured status expired. *Johnson v. Shalala*,

26  60 F.3d 1428, 1432 (9th Cir.1995); *see also Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d

27

28  [3] "AR" refers to the certified administrative record lodged with the Court. Dkt. No. 15.

3

1453, 1459 (9th Cir. 1995) (observing that "the phrase 'period of disability' is a 'term of art' that means that the person is disabled, cannot work, and is insured.") (quotation and citation omitted).

### A.  Summary of Medical Records

The record includes medical evidence of Ms. Doto's treating physicians, her physical therapists, and two state agency reviewing physicians.  The medical evidence spans the period of time from September 2010 to July 2015.

#### 1.  Medical evidence pre-dating the expiration of Ms. Doto's date last insured

In September 2010, Ms. Doto established care at Kaiser Permanente with Dr. Hedviga Arsene, M.D.  Ms. Doto, who was 5'7" and weighed 396 pounds at that time, reported that she had lost over 40 pounds with Weight Watchers.  She complained of having low back pain for the past week after straining her back.  She was diagnosed with hypertension, hypothyroidism, and low back pain.  AR 269-70.  Dr. Arsene prescribed ibuprofen, heat and ice, and back exercises to relieve the pain.  *Id*.  Ms. Doto's further treatment in 2010 consisted of a report of menstrual pain in October and a cold for one week in December.  *Id*. at 272, 277.

On January 26, 2011, Ms. Doto saw Dr. Susan MacLean, M.D. at Kaiser, complaining of neck discomfort and tingling down her arms and into her hands.  Dr. MacLean noted that Ms. Doto "struggled with severe obesity all her life.  She was over 300 pounds at age 13.  Her lowest weight was 216 after Optifast.  But slowly she gained the weight back."  AR 280.  Dr. MacLean further observed that Ms. Doto had a somewhat slouching posture, but nevertheless found that her range of motion turning side to side was good; she had full range of motion in her shoulders without pain; and that her strength and sensation were normal.  *Id*. at 281.  Dr. MacLean suspected some cervical degenerative arthritis, or possible degenerative disc disease, causing some mild radiculopathy in both arms.  She ordered x-rays of the cervical spine, which showed only mild degenerative changes in Ms. Doto's neck, most prominent at C6-7, and no evidence of acute bony injury.  *Id*. at 281, 283.  Ms. Doto was referred to physical therapy, which she found "very helpful."  *Id*. at 287, 290.

On February 2, 2011, Ms. Doto was examined by Dr. Elisabeth Anna Calvelli, M.D. at

Kaiser. Ms. Doto reported that she lived with her husband and daughter and did swim aerobics three times per week. AR 296. She further noted that, although she used to work as a paramedic and nurse, she now cared for her husband, who had been injured.[4] *Id.* Dr. Calvelli noted that Ms. Doto was positive for edema that is worse when she sits, as well as for numbness and tingling on her right thigh. *Id.* Dr. Calvelli also noted "Super Super Severe Obesity," with a body mass index between 60-69.9, and advised Ms. Doto about Kaiser resources for weight loss and exercise *Id.* at 297.

Ms. Doto subsequently missed a February 14, 2011 appointment with a nutritionist. AR 304. She also cancelled two physical therapy sessions in February and March 2011, but told her therapist, Winifred Burns, that she had been doing her exercises and felt "that her neck is a little better" and that "her low back is doing ok now." *Id.* at 306. The record does not reflect the reasons, if any, for these missed and cancelled appointments.

On March 28, 2011, Ms. Doto saw Ms. Burns and reported that her symptoms were a little better since her last visit. AR 309. Although she said she was still having trouble turning her head from side to side and raising her arms overhead, Ms. Doto reported overall less tingling in her arms. *Id.* She complained of intermittent dull pain and ache in her neck and upper back, as well as tingling in both arms when reaching out in front of her. *Id.* Ms. Doto reported the pain level as being a 5 on a scale of 10. *Id.* Ms. Burns assessed that Ms. Doto's symptoms were consistent with cervical radiculopathy and that Ms. Doto had moderate postural factors that increased the strain on her cervical spine. Noting that Ms. Doto reported a decrease in cervical spine tightness after her treatment that day, Ms. Burns concluded that Ms. Doto would benefit from working on an exercise program to address postural factors. *Id.* at 310.

In May 2011, Ms. Doto saw Dr. MacLean for evaluation of a fever and sore throat, noting that her daughter had been diagnosed with strep throat. Ms. Doto expressed concern because "her husband has immunocompromise with paraplegia." AR 317. She was assessed as likely having strep throat, given her exposure history and family contact, and Dr. MacLean prescribed

---

[4] Other records indicate that Ms. Doto's husband was injured in a car accident. AR 556.

Zithromax for 7 days.  *Id.* at 318.  At that time, Ms. Doto was exercising three times per week for 50 minutes each time.  *Id.* at 316.  The record does not reflect the nature of the exercise.

The following month, Ms. Doto returned to Dr. MacLean, complaining of a feeling that something was in her throat.  Noting that she had a history of food allergies, Ms. Doto requested a reassessment by an allergist.  AR 335.  Ms. Doto's heart rate and rhythm were normal, and her breathing was clear and unlabored.  *Id.* at 342.  She was assessed with mild dermatographia, and testing indicated only minimal allergies to dust and some pollens.  *Id.* at 370.  At that time, Ms. Doto reported that she swam  three times per week, now for 60 minutes each time.  *Id.* at 334-35.

On October 6, 2011, Ms. Doto saw Dr. MacLean "to discuss her reduced mobility." AR 397.  Ms. Doto reported that she had gained 35 pounds in 6 weeks, resulting in reduced mobility and an increase in leg obesity, swelling, and heaviness.  Additionally, Ms. Doto said that she could not sit for more than 30 minutes and needed to move due to leg swelling and heaviness. She also reported not being able to stand more than 20 minutes and was having difficulty moving her legs to walk.  At that time, Ms. Doto continued doing water exercises, which she enjoyed, but said that as soon as she was back on land, she could barely move.  Dr. MacLean noted, "I can also see that [Ms. Doto] can not [sic] work given leg obesity," and she wrote a note for Ms. Doto "to be off work/on disability 9/1/11-3/1/12."  *Id.* at 398.

About a week later, Ms. Doto returned to Dr. MacLean, stating that she started a diet and had lost 9 pounds.  She reported that her ankles were better and that she was able to put on her shoes.  AR 403.  Ms. Doto also noted that while shopping the day before, she felt dizzy and nauseated, with some visual symptoms and slight photophobia, similar to a migraine.  Dr. MacLean diagnosed an ophthalmic migraine and recommended continued treatment for hypertension and hypothyroidism.  *Id.* at 404.

On January 8, 2012, Ms. Doto visited Kaiser complaining of low back and pelvic pain. She reported having a spasm in her lower back two days before while walking, and said that if she was sitting still, she had no back pain, but could feel some pressure.  AR 413.  She was assessed with low back pain, likely musculoskeletal.  *Id.* at 415.  An x-ray showed mild lumbar spine degenerative changes.  *Id.* at 424.

In June 2012, Ms. Doto saw endocrinologist Karen L. Herbst, M.D. in San Diego. Ms. Doto reported that before age 9, she was not overweight, but by age 14 she weighed 265 pounds. Ms. Doto further stated that all the weight was located from her hips down; that she had always had painful legs; that any pressure on the legs hurt; and that by the end of the day, she felt like she was "dragging tree trunks." AR 556. Ms. Doto also noted that whenever she lost weight, the weight loss was from her upper chest. She said that, at one point, she lost 120 pounds, "but still had the same bottom" and "looked anorexic on the top." *Id.* Additionally, Ms. Doto stated that she could gain 15 pounds in a day, depending on how swollen her legs were, but that her feet never swell. *Id.* Ms. Doto told Dr. Herbst that she was doing yoga and swimming (water Zumba three times per week), but reported that her knee was starting to hurt; sitting for a long time caused pain; and office work was hard because she had to put her feet up. *Id.* at 557.

Dr. Herbst noted that Ms. Doto bruised easily and had unexplained weight loss and gain, stress, lumps in fat, palpitations, itching, burning sensations, fatigue, low body temperature, bloating, diarrhea, constipation, abdominal pain, and areas of hard fat near her abdomen. AR 556-58. Dr. Herbst further noted that Ms. Doto has vascular water retention during the day, edema, and visible veins on the legs and arms. Additionally, Dr. Herbst's report indicates that Ms. Doto had chronic nasal congestion and that she experienced muscle and joint aches and lower back pain. *Id.* at 558. Dr. Herbst diagnosed Ms. Doto with hypermobile joint disorder, which affects the connective tissue in the joints, as well as lipedema (Stage 3, Type IV).[5] *Id.* at 561. Dr. Herbst's recommended treatment included compression devices and dextroamphetamine. *Id.* at 562-65. Although Dr. Herbst noted the possibility of lupus, subsequent tests showed no basis for a diagnosis of lupus. *Id.* at 462, 557.

On June 21, 2012, Ms. Doto started treatment with endocrinologist Dr. Soo Jean Eng at Kaiser. Ms. Doto reported that she had started the recommended diet and would continue with water exercises. On examination, Ms. Doto was found to have no shortness of breath; normal

---

[5] According to Dr. Herbst's report, the stage of the disease refers to how the skin and tissue appear visually, and the type of lipedema refers to the location of the fat. AR 561. Stage 3 has larger out-pockets of tissue. Type IV means that both the arms and legs are affected. *Id.*

7

heart rate and regular rhythm; and full range of motion in her back, with no tenderness, palpable spasm, or pain on motion, and no kyphosis. AR 457. Dr. Eng observed that Ms. Doto was "notable for excessive, large pockets of lobular fat that deform her thighs and calves, less so her upper arms. Her hands and feet are spared," and also noted "[h]ypermobility of joints." *Id.* at 458. Dr. Eng assessed Ms. Doto with lipomatosis, hypothyroidism, and hypertension. *Id*. Pursuant to Dr. Herbst's recommendations, Ms. Doto was to start on dextroamphetamine and was referred to physical therapy for lymphatic drainage massage. It was also recommended that Ms. Doto continue with her diet, water exercises, selenium, and compression clothing. *Id*.

On July 2, 2012, Ms. Doto requested an orthopedic referral based on Dr. Herbst's concern about the lipedema in her right knee encroaching into the muscle tissue around the knee joints. Ms. Doto also asked to see a podiatrist, stating that she had pain in her feet and had previously had plantar fasciitis. AR 488-91.

Several days later, on July 5, 2012, Ms. Doto returned to Dr. Eng for a follow-up examination. Dr. Eng noted that Ms. Doto was mostly following Dr. Herbst's recommended diet and that Ms. Doto felt more alert and clear. AR 500. Ms. Doto again showed full range of motion in her back, with no tenderness, palpable spasm, or pain on motion, and no kyphosis. Neurological functioning was normal. *Id.* at 500-01. Ms. Doto was to continue with dextroamphetamine, and with her diet, water exercises, selenium and compression clothing. Dr. Eng also resubmitted a referral to physical therapy for lymphatic drainage massage. *Id*.

On July 13, 2012, Ms. Doto visited Kaiser complaining of right knee pain. X-rays of Ms. Doto's knees were noted as unremarkable. AR 508. A secondary review, however, found mild medial compartment joint narrowing, and Ms. Doto was assessed with very mild bilateral knee degenerative joint disorder and possible right knee patellar tendinitis. *Id.* at 515. Nevertheless, no knee surgery was indicated, and it was noted that physical therapy might help with her right knee pain. *Id*. An MRI of the left knee was obtained on July 25, 2012. There was a suggestion of a small Baker's cyst, as well as mild thinning articular cartilages at the medial joint compartment. *Id.* at 523. Subsequent MRIs of Ms. Doto's knees showed some mild osteoarthritis in the medial compartment. *Id.* at 526.

On July 24, 2012, Ms. Doto consulted with physical therapist Janet Smick. Ms. Doto reported that her knee pain was getting worse and expressed concern about her ability to walk over time. She also stated that she had difficulty sitting, due to the sensitivity of the skin on her buttocks and legs, and said that any length of time on her feet would increase pain and swelling in her legs. AR 520. Noting that Dr. Eng was the referring provider and that the "Referring Diagnosis" was "Congenital Lymphedema,"[6] Ms. Smick observed that Ms. Doto had been very consistent with exercise (swimming 4 times per week for 60 minutes at a time) and that Ms. Doto reported that the exercise felt very good. *Id.* Ms. Smick assessed that Ms. Doto would benefit from appropriate compression devices, and from a home exercise program of hip and knee strengthening to manage her knee pain. *Id.* at 521. A physical therapy plan of care was established, including 12-week goals for Ms. Doto to demonstrate independence in a home self-care and exercise program, and to walk within functional limits, with knee pain no greater than a 4 on a scale of 10. *Id.* at 519-20.

Ms. Doto missed a physical therapy appointment in August (AR 539), but saw Ms. Smick again on August 31, 2012. Ms. Smick noted that Ms. Doto's leg range of motion in the ankle/knee and hip were within functional limits (with limitation by soft tissue approximation) and that Ms. Doto was able to "sit in long leg sitting easily" and reach her feet. *Id.* at 548. Ms. Smick's report reiterated the previously established physical therapy plan involving home self-care and exercise, and the use of appropriate compression devices. *Id.* at 549.

In October 2012, Ms. Doto returned to Dr. Eng for a follow-up regarding her lipedema. Ms. Doto stated that she was adhering to Dr. Herbst's recommended diet. She also reported feeling tired and said she needed to elevate her legs throughout the day, but said she still exercised in the pool a couple of times per week. She also noted that she was waiting for her compression stockings and would be applying for disability. On examination, Ms. Doto had no shortness of

---

[6] As discussed more fully below, the Commissioner disputes whether Ms. Doto was diagnosed with lymphedema, as opposed to lipedema, prior to her last date insured. Based on Ms. Smick's records, Ms. Doto contends that Dr. Eng diagnosed lymphedema. However, Dr. Eng's records refer to lipedema, not lymphedema, and reveal that her diagnosis was lipomatosis. *See, e.g.,* AR 456, 458, 494, 499, 500, 501, 509, 510, 582, 584, 1958, 1960.

breath, and again showed full range of motion in her back, with no tenderness, palpable spasm, or pain on motion, and no kyphosis. Neurological function was normal. AR 583. Ms. Doto was directed to continue with dextroamphetamine, diet, water exercises, selenium, and compression clothing. *Id.* at 584.

In December 2012, Ms. Doto returned to Dr. Herbst in San Diego for a follow-up appointment. Ms. Doto reported that she started Aderall and that it cleared her head and decreased the swelling in her legs, although she still had bruising and pain. Ms. Doto had also recently received compression stockings, which she could wear for five hours, but they limited her mobility. Additionally, Ms. Doto reported that her leg pain had gotten worse while sitting or standing; that her legs got worse if they were in the "down" position too long; and that she did not think she could work even a 5-hour day. AR 551. Dr. Herbst observed that Ms. Doto's gait was normal and that she did not use an assistive device. *Id.* at 554. Further, Dr. Herbst noted that Ms. Doto "has made some big changes and has noticed a lot of improvement in her life" and said that "with continued MLD[7], some night time arm garments in addition to her leg garments and continued compression plus her slowly increasing Adderall dose, I think she will continue to feel better and notice less heaviness and fibrosis in her legs." *Id.*

### 2. Medical evidence post-dating the expiration of Ms. Doto's disability insurance coverage

On February 11, 2013, Ms. Doto visited the Kaiser emergency department, complaining of chest discomfort. AR 640. A chest x-ray revealed a subtle pulmonary embolism in the secondary branches of the bilateral upper lobe and left lower lobe pulmonary arteries, as well as a 2.8 centimeter hiatal hernia. *Id.* at 643. An EKG showed sinus tachycardia with abnormal inferior Q waves. *Id.* at 785. Ms. Doto was admitted to the hospital and her pulmonary embolism was treated with IV Heparin plus Warfarin. *Id.* at 663. She was discharged on February 21, 2013 in stable condition for follow-up as an outpatient. *Id.* at 664. Ms. Doto was told to take 12 mg of Warfarin and was referred to the Anticoagulation Clinic. *Id.*

Ms. Doto saw Dr. MacLean on February 28, 2013 for a post-hospitalization follow-up,

---

[7] The Court assumes that Dr. Herbst is referring to manual lymphatic drainage.

1   reporting more fatigue with exertion than normal. AR 972. At Ms. Doto's request, Dr. MacLean

2   referred her for a pulmonary consultation. *Id.* at 973.

3        Dr. David Goya, D.O. conducted the pulmonary consultation on March 5, 2013. Ms. Doto

4   denied shortness of breath, but said that she had difficulty climbing stairs and moving quickly.

5   She also noted some pleuritic chest pain. AR 982. Dr. Goya recommended lifelong Coumadin

6   (an anticoagulant), noting that Ms. Doto had significant risk for recurrent pulmonary embolism.

7   He arranged for a ventilation-perfusion (VQ) scan and a sleep study. *Id.* at 985.

8        Ms. Doto returned to Dr. MacLean on March 19, 2013, stating that she was snoring more

9   and had more nasal and sinus congestion. AR 1022. Dr. MacLean noted that a sleep apnea test

10   was pending. *Id*. She prescribed Flonase and filled out a disability placard. *Id*. at 1023-24.

11        On May 7, 2013, Ms. Doto had an overnight inpatient stay at Kaiser. She went to the

12   emergency room, complaining of shortness of breath and dizziness. AR 1074. A lung scan

13   revealed a moderate to large subsegmental mismatched perfusion abnormality in the left lower

14   lobe posterior basal segment, an intermediate probability for pulmonary embolism. Ms. Doto was

15   directed to follow up with the pulmonology department. *Id.* at 1106.

16        On May 9, 2013, Ms. Doto followed up with Dr. Goya, reporting that she still felt fatigued

17   and noticed some dizziness when changing positions. She also noted having occasional chest

18   pain, but not to the level of severity that caused her to go to the emergency room. AR 1115. She

19   denied shortness of breath, but noted difficulty climbing stairs and moving quickly. Dr. Goya

20   recommended exercise and continuation of Ms. Doto's current medications and Coumadin. He

21   made arrangements for another VQ scan for September, with plans to follow up with Ms. Doto in

22   six months. *Id.* at 1119.

23        Ms. Doto had another inpatient stay at Kaiser from May 29, 2013 to June 4, 2013. She

24   reported shortness of breath and chest discomfort and was assessed with sinus tachycardia and

25   severe sepsis. AR 1166. Ms. Doto requested a walker and was noted to be limited in her mobility.

26   Nevertheless, Ms. Doto reported that she was able to cook and clean and care for her 7-year old

27   daughter. AR 1187.

28        On July 11, 2013, Ms. Doto visited Kaiser for a back injury, stating that she may have

11

twisted her back the day before while picking something up from the floor. The report notes that Ms. Doto had been using a walker since June. AR 1539. She was assessed with lumbar strain and advised to take Tylenol and to use an ice pack. *Id.* at 1540.

Ms. Doto returned to Kaiser several days later for low back pain. X-rays revealed degenerative changes of the lumbosacral spine and sharp anterior angulation of the coccyx relative to the sacrum. AR 1550, 1554.

On September 3, 2013, Ms. Doto visited Kaiser complaining of eye problems, as well as intermittent neck pain and dizziness. AR 1636. She reported that her low back pain improved significantly with physical therapy and TENS, and that she felt happier and more energetic. Ms. Doto was assessed with dry eyes and advised to use artificial tears as needed. *Id.* at 1643. She was instructed to start home exercises for her neck pain. And as recommended by her physical therapist, it was suggested that Ms. Doto meet with a spine specialist. *Id.* at 1638.

On January 3, 2014, Ms. Doto had an overnight stay at Kaiser for vaginal bleeding, shortness of breath, dizziness, and pain in her right calf. AR 1689. Examination revealed normal respiratory effort. Her right calf was tender to palpation, but she otherwise had musculoskeletal full range of motion. Strength was normal and sensation intact. *Id*. 1692. She was noted as being mobile and able to move her extremities. *Id.* at 1704. A pelvic ultrasound revealed a small nodule that may represent a polyp or fibroid. *Id.* at 1706. Ms. Doto was given a transfusion. In a subsequent follow-up visit, she reported that her bleeding had stabilized with norethindrone. *Id*. at 1752.

On February 4, 2014, Ms. Doto visited Kaiser complaining of intermittent left shoulder and neck pain for the past 10 days. She was assessed with tendinitis of the left shoulder and cervical radiculopathy and was given acetaminophen for pain control. AR 1765-66.

Ms. Doto applied for disability benefits on February 14, 2014. In April 2014, state agency physician S. Brodsky, D.O., reviewed her records. AR 67-69. Noting that Ms. Doto was "severely obese," Dr. Brodsky concluded that she did not meet or equal any disabling listed impairments, but that her obesity would significantly impact her performance with respect to weight-bearing, cardiac, and respiratory symptoms. *Id.* at 69. While Dr. Brodsky found that Ms.

Doto had medically determinable impairments of obesity, back disorders (discogenic and degenerative), and muscle disorders (ligament and fascia), and that those impairments could be expected to produce pain and other symptoms, Dr. Brodsky concluded that Ms. Doto's subjective complaints were not substantiated by the medical evidence alone. *Id.* at 69-70. Dr. Brodsky opined that Ms. Doto had the RFC to stand and walk slightly less than 2 hours per day; sit about 6 hours per day; lift and carry up to 20 pounds occasionally and 10 pounds frequently; occasionally perform postural activities; but never climb ropes, ladders, or scaffolds. *Id.* at 70-71. Finding that Ms. Doto could adjust to other work in view of her age, education and RFC, Dr. Brodsky concluded that she was not disabled. *Id.* at 72-73. Accordingly, Ms. Doto's application was denied.

On her request for reconsideration, state agency physician A. Nasrabadi, M.D. reviewed Ms. Doto's records in August 2014. Dr. Nasrabadi noted Ms. Doto's worsening condition, but stated that was not relevant unless Ms. Doto established that she was disabled before her December 31, 2012 date last insured. AR 81. Dr. Nasrabadi agreed with Dr. Brodsky's RFC findings, and found that Ms. Doto could perform sedentary work before December 31, 2012 and therefore was not disabled. *Id.* at 85.

On September 25, 2014, Ms. Doto returned to endocrinologist Dr. Eng for a follow-up regarding her lipedema. Ms. Doto reported progression of the disease, noted that her arms and legs were larger, and stated that the pain level can be an 8 on a scale of 10 at the end of the day. She also reported difficulty standing for more than 5 minutes without pain, but denied shortness of breath except with exertion. The report notes that Ms. Doto was using compression and massage and was doing water aerobics 90 minutes per day. AR 1959. A back exam revealed full range of motion, with no tenderness, palpable spasm or pain on motion, and no kyphosis. Ms. Doto's neurological exam was normal. Her musculoskeletal exam was notable for excessive, large pockets of lobular fat on her thighs and calves, less so on her upper arms, but more than on Ms. Doto's last visit two years before. *Id.* at 1960.

On November 23, 2014, Ms. Doto had an overnight stay at Kaiser for back pain and chest tightness. She reported that the chest pain started the day before; that she took Tylenol (without

1    relief); and that she was able to go to a dinner party, but felt worse afterward.  She further noted

2    that her current symptoms were milder than those she experienced when she initially was

3    diagnosed with a pulmonary embolism.  AR 1992.  An angiogram was inconclusive and a VQ

4    scan showed low probability for pulmonary embolism.  Ms. Doto was diagnosed with

5    muculoskeletal pain, and the medical report notes that she planned to use ice and heat and to try

6    Ultram instead of Tylenol.  *Id.* at 2000.

7         In April 2015, Ms. Doto returned to Dr. Herbst (who had since relocated to Arizona) for a

8    follow-up visit.  Dr. Herbst noted that in 2010, Ms. Doto was unable to work for periods of time.

9    AR 2238.  Additionally, Dr. Herbst's report notes that on "[t]he lower extremity functional scale

10   (LEFS)," which is "a measure of disability for the legs," Ms. Doto scored a 10 out of 80,

11   indicating that she was "severely disabled."  AR 2243.

12        In a July 2015 physical RFC questionnaire, Dr. Herbst opined that Ms. Doto was incapable

13   of even low-stress jobs and could not walk without severe pain due to diagnoses of "lipedema

14   stage 3; hypermobile joint disorder, Lymphedema (stage 4 lipo-lymphedema)" and that Ms.

15   Doto's prognosis was "poor."  Dr. Herbst further noted that Ms. Doto's pain level in her legs was

16   a 6 out of 10, and had also recently spread to Ms. Doto's upper arms.  Dr. Herbst declined to

17   complete the remainder of the questionnaire concerning Ms. Doto's postural and exertional

18   capabilities, stating that she was not trained to answer those questions.  But, she  noted that Ms.

19   Doto's LEFS score was 8 out of 80, indicating that she was severely disabled.[8]  And Dr. Herbst

20   stated that the limitations assessed in the questionnaire applied since 2010.  AR 2250-54.

21        Also in July 2015, physical therapist Teri Burk, who first saw Ms. Doto on June 15, 2015,

22   submitted a physical RFC form for Ms. Doto's application for disability benefits.  Ms. Burk wrote

23   that Ms. Doto was incapable of even low-stress jobs; could not walk without severe pain (and

24   would need to use a scooter); could only sit for 15 minutes at a time; could only stand for 10

25   minutes at a time; could sit and stand or walk less than 2 hours per day; and could never lift any

26

27   _____

28   [8] It is unclear whether there is a discrepancy in Dr. Herbst's reports as to whether Ms. Doto scored
     an 8 or a 10 on the LEFS test, or whether the test might have been administered more than once.
     Either way, Dr. Herbst states that Ms. Doto's score indicated severe disability.  AR 2243, 2251.

weight. Additionally, Ms. Burk opined that during an 8-hour work day, Ms. Doto would need to get up and walk every 15 minutes for 5 minutes each time, and that Ms. Doto would need to elevate her legs above her heart with prolonged sitting. Ms. Burk further noted that Ms. Doto could occasionally turn her head, but could rarely look up or down; rarely twist; never stoop, crouch, or climb; and could use her hands (i.e. for fine finger manipulations), at most, 10% of the time. Additionally, Ms. Burk wrote that Ms. Doto would miss more than 4 days of work per month and that the limitations described in her RFC form applied since 2011. AR 2279-83.

### B. Administrative Proceedings

As discussed above, Ms. Doto's application for disability insurance benefits was denied initially and upon reconsideration. She requested a hearing before an ALJ. At the hearing, the ALJ received testimony from Ms. Doto and from a vocational expert ("VE").

#### 1. Ms. Doto's Testimony

Ms. Doto testified that she had lipedema since the age of 9, although she did not know she had the disease until it was diagnosed in 2012, when she was in her late thirties. AR 36, 43. She said that in 2010, she was having problems sitting because her "legs are very painful" and that any "pressure on them just physically hurts." AR 36. Although standing provided a minute or two of relief, Ms. Doto testified that she would experience pain "like a burning sensation" when she sat back down. *Id.* at 37. At that time, she was working as an account manager and said she found it "hard to focus on my job because all I kept thinking was I want to not be sitting" and "just experienced an immense amount of pain." *Id.* at 37, 171. Ms. Doto further testified that she knew her symptoms were worsening in 2006 when she "went from being able to do standing jobs like being a medical assistant, being [an] EMT, to looking for any kind of sedentary job that I could find because standing on my feet made the bottoms of my legs swell." *Id.* at 38. And by 2010, she began having work attendance issues because she spent time in the restroom elevating her feet. *Id.*

Although she did not know what was wrong, Ms. Doto testified that she did not go to her doctors and talk about her symptoms very often, because everyone told her that she was obese and would not improve until she lost weight. She later learned, however, that the nature of lipedema is

such that it is unaffected by weight loss.  AR 38.

Ms. Doto further testified that in 2010, she began having difficulty caring for herself, such as getting into the shower or getting dressed.  *Id.* at 39.  And in 2011, she could not sit at home for periods of time and found it better to lay on her stomach because it took the pressure off of her backside.  *Id. at* 40.  She visited her doctor in 2011 about her leg problems, but testified that "we thought it was obesity.  I didn't know that it was anything else."  *Id*.  Her doctor prescribed a diet, which had no effect on her arms or legs.  *Id.* at 41-42.  While looking for answers to her leg problems, Ms. Doto found Dr. Herbst, who as discussed, diagnosed lipedema and hypermobility joint disorder in 2012.  *Id.* at 42-43.

Ms. Doto testified that lipedema affects every aspect of her life, that her legs are very heavy and leak fluid, and that she is prone to infection.  AR 43.  She stated that she was not able to do things she could do before, such as walk around the zoo or to go places with her family.  *Id.* at 44.  She testified that the lipedema makes it difficult to lift her arms because they are very heavy, and she tires easily from trying to do things, such as brush her teeth or shampoo her hair.  *Id.* at 50.  While she is able to reach forward, she cannot maintain that posture for a long period of time.  *Id*.  As for her hypermobility joint disorder, Ms. Doto noted that throughout her life, she would constantly injure herself or pull her joints out.  *Id.* at 44.  Traveling "is very problematic" because she has to have two seats and needs to be in the bulkhead so she can elevate her legs.  *Id.* at 45.  She testified that she cannot now sit for very long periods of time due to "pain just from having my feet down and from being on my . . . backside."  *Id*.  However, Ms. Doto noted that standing is also problematic, stating that "when I stand up, first stand up the blood goes back into my legs and it's very painful.  They're very numb and they, they hurt."  *Id*.

Ms. Doto testified that she had been using a mobility cart "[f]or about two and a half years," and that she uses it whenever she goes out.  AR 47.  She testified that she can walk a few steps at home, but that walking is difficult and that she had been using a cane and walker since the "end of 2012, 2013."  *Id.* at 48.

16

### 2. The VE's Testimony

The ALJ presented the VE with a hypothetical claimant who can lift 20 pounds occasionally and 10 pounds frequently; stand and walk 2 hour per work day; occasionally perform postural activities; but never climb ropes, ladders, or scaffolding; and cannot push or pull any leg controls and only occasionally can push and pull arm controls. AR 56-57. The VE testified that a person with those capabilities would be able to perform all of Ms. Doto's past work. *Id.* at 57. In response to questioning by Ms. Doto's attorney, the VE testified that his conclusion about the ability to perform past work would not change if the hypothetical reflected the ability to sit for only 15 minutes at a time, no overhead reaching, and no exposure to intense heat or cold. *Id.* at 60-61. However, the VE testified that all work would be precluded if the hypothetical claimant required more than a small stool to elevate her feet and needed to extend her body or limb, for significant portions of the workday beyond scheduled breaks. *Id.* at 61-62. The VE testified that employers typically will tolerate an employee being "off task" no more than 15 percent of the time, exclusive of breaks, during a work day, and being absent no more than two days' per month on a consistent monthly basis. *Id.* at 62.

### 3. The ALJ's Decision

At step one of the sequential analysis, the ALJ found that Ms. Doto last met the insured status requirements of the Act on December 31, 2012 and that she had not engaged in substantial gainful activity since the alleged onset date of August 1, 2010 through her last date insured. At step two, the ALJ found that Ms. Doto has the following severe impairments: lipedema; hypermobility joint disorder; and obesity (20 C.F.R. § 404.1520(c)). However, at step three, the ALJ determined that, through December 31, 2012, Ms. Doto did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d), 404.1525, and 404.1526).

Before step four, the ALJ determined that Ms. Doto has the RFC to lift or carry 20 pounds occasionally and 10 pounds frequently; only stand or walk 2 hours in an 8-hour work day; only perform occasional postural activities, but never climb ropes, ladders, or scaffolds; and cannot

17

push or pull any leg controls and only occasionally can push or pull arm controls. In doing so, the ALJ gave little weight to the opinions of treating physicians Drs. Herbst and MacLean, and physical therapist Ms. Burk, and instead gave significant weight to the opinions of the non-examining state agency physicians, Drs. Brodsky and Nasrabadi. At step four, the ALJ concluded that Ms. Doto was not disabled under the Act from August 1, 2010 through December 31, 2012 because he found that she was capable of performing past relevant work as a medical assistant, customer service clerk, and an administrative clerk and that this work did not require performance of work-related activities precluded by Ms. Doto's RFC.

The Appeals Council denied Ms. Doto's request for review, and the ALJ's decision became the Commissioner's final decision. Ms. Doto now seeks judicial review, arguing that the ALJ erred by (1) concluding, at step three of the sequential analysis, that her impairments did not meet or equal the severity of listed impairments; (2) giving greater weight to the opinions of the non-examining state agency physicians and discrediting the opinions of Ms. Burk, Dr. Herbst and Dr. MacLean; and (3) improperly assessing her obesity and pain allegations. The Commissioner contends that the ALJ's decision is correct and free of legal error.

## III.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review the Commissioner's decision to deny benefits. The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995). In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance—it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523; *see also Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992). When determining whether substantial evidence exists to support the Commissioner's decision, the court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257*; Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Where evidence exists to support more than one rational interpretation, the court must defer to the decision of the

Commissioner.  *Moncada*, 60 F.3d at 523; *Drouin*, 966 F.2d at 1258.

## IV.    DISCUSSION

### A.    The ALJ's Step Three Analysis

As noted, the ALJ found that Ms. Doto has severe impairments of lipedema, hypermobility joint disorder, and obesity, but nonetheless concluded that her impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  His decision states, in relevant part:

> This finding is also based on the evidence in the record.  Although Listing 4.11 (chronic venous insufficiency) was specifically considered, the relevant treatment history does not clearly document that the criteria of this listing—including the requisite extensive brawny edema involving two-thirds of the leg or superficial varicosities, statis dermatitis, or recurrent or persistent ulceration—has been met or equaled.

AR 15.  Ms. Doto does not challenge that conclusion.  Instead, she contends that the ALJ erred by failing to consider whether she met or equaled the Commissioner's Listing 1.02A, which pertains to disability based on a major dysfunction of a joint.

The Commissioner does not dispute that the ALJ did not consider Listing 1.02A.  Rather than address plaintiff's argument directly, the Commissioner confuses the issue by contending that Ms. Doto "argues that her impairments equaled Listing 1.02A because of 'congenital lymphedema,'—a condition that she does not even have."  Dkt. No. 22 at 2:21-22.  However, Ms. Doto's arguments are based, not on lymphedema, but upon her hypermobility joint disorder.  Dkt. No. 20 at 7.  At most, the Commissioner seems to suggest that the ALJ impliedly considered Listing 1.02A because he gave significant weight to the opinions of the state agency physicians, who considered that listing and concluded that Ms. Doto did not meet it.  The ALJ, however, did not expressly credit or discuss that portion of the agency physicians' reports.  The Court "reviews only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  The Commissioner nonetheless maintains that Ms. Doto has not shown that she met or equaled any listing.

The Commissioner's Listing of Impairments "describes specific impairments of each of the

1    major body systems 'which are considered severe enough to prevent a person from doing any

2    gainful activity.'" *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) (quoting 20 C.F.R.

3    § 404.1525). Thus, a claimant who meets or equals a listed impairment is considered disabled at

4    this step of the sequential analysis without further inquiry. *Id*.

5         "To *meet* a listed impairment, a claimant must establish that he or she meets each

6    characteristic of a listed impairment relevant to his or her claim." *Tackett*, 180 F.3d at 1099. "To

7    *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at

8    least equal in severity and duration' to the characteristics of a relevant listed impairment, or, if a

9    claimant's impairment is *not* listed, then to the listed impairment 'most like' the claimant's

10   impairment." *Id*. (quoting 20 C.F.R. § 404.1526). "A claimant must 'present medical findings

11   equal in severity to *all* the criteria for the one most similar listed impairment.'" *Kennedy v.

12   Colvin*, 738 F.3d 1172, 1174 (9th Cir. 2013) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531

13   (1990)). "An impairment that manifests only some of those criteria, no matter how severely, does

14   not qualify." *Zebley*, 493 U.S. at 530.

15        "An ALJ must evaluate the relevant evidence before concluding that a claimant's

16   impairments do not meet or equal a listed impairment." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th

17   Cir. 2001). "A boilerplate finding is insufficient to support a conclusion that a claimant's

18   impairment does not do so." *Id*. Nevertheless, an ALJ does not err by failing to address whether

19   the claimant's combination of impairments medically equals a Listing where the claimant offers

20   no plausible theory as to how her impairments equal a listed impairment. *Id*. at 514.

21        Although the ALJ did not specifically consider whether Ms. Doto met or equaled Listing

22   1.02A, Ms. Doto's contention seems to be that he should have considered it because the listing

23   "was identified by the agency's disability determination services at the initial application." Dkt.

24   No. 23 at 2:14-15. However, there is no indication that Ms. Doto claimed or argued that she met

25   or equaled Listing 1.02A. *See Kennedy*, 738 F.3d at 1178 (explaining that "[a]n ALJ is not

26   required to discuss the combined effects of a claimant's impairments or compare them to any

27   listing in an equivalency determination, unless the claimant presents evidence in an effort to

28   establish equivalence," and holding that the ALJ did not err where the claimant "never presented

evidence or advanced an argument for equivalency").

In any event, Ms. Doto has not met her burden to show that the ALJ erred at step three of the sequential analysis. In her opening motion, Ms. Doto contends that there is ample evidence of her diagnoses and of the progression of her impairments, and argues: "The ALJ finds Doto has a hypermobility joint disorder diagnosed June 2012 (AR 14). As such, Doto meets or equals listing 1.02 a major dysfunction of joints due to her diagnosis of hypermobility joint disorder." Dkt. No. 20 at 7:15-17. However, "[t]he mere existence of an impairment is insufficient proof of a disability," *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993), and a claimant cannot meet a listing based solely on the diagnosis of a listed impairment, 20 C.F.R. § 404.1525(d). Rather, the claimant "must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d).

In her reply, Ms. Doto argues that she meets or medically equals Listing 1.02A, which describes a major dysfunction of a joint as follows:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02A.[9] Listing 1.00B2b, in turn, provides:

> b. What We Mean by Inability To Ambulate Effectively
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held

---

[9] This Court applies the listing in effect at the time Ms. Doto filed her application for disability benefits, namely, the version in effect on February 14, 2014. *See Kee v. Berryhill*, No. 16-cv-05170-MMC, 2018 WL 1640063, at *3 n.7 (N.D. Cal., Apr. 5, 2018) (citing *Maines v. Colvin*, 666 Fed. App'x. 607, 608 (9th Cir. 2016). In any event, the Court finds no difference between that version of the listing and those cited by the parties.

assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B2b.

Ms. Doto argues that the ALJ overlooked evidence that she used a mobility cart and a cane. She points out that in a June 2014 Headache Questionnaire, she reported that she uses a wheelchair, and sometimes a cane or walker, and that a November 2014 Kaiser assessment form notes that her "Existing DME [Durable Medical Equipment]" included a mobility cart. AR 206, 2003. She also points to her June 2015 written narrative, which indicates that sometime around 2009 or 2010 she "began using a mobility cart for long walks and a cane walker for short ones," as well as to her testimony at the July 17, 2015 administrative hearing where she stated that she had been using a cane and walker since the "end of 2012, 2013." *Id.* at 48, 2272-73.

However, those records all post-date the expiration of Ms. Doto's disability insured status and, aside from Ms. Doto's personal narrative and testimony, they do not indicate that her use of the identified assistive devices predated the expiration of her insured status. Moreover, the ALJ specifically considered Ms. Doto's testimony that she had been using a motorized mobility cart for two and a half years and a cane and walker since the end of 2012 or 2013. AR 18 n.5, 48. He nevertheless correctly observed that during her December 2012 visit, Dr. Herbst noted that Ms. Doto had a normal gait and "does not use [an] assistive device." AR 554. Accordingly, the Court finds no error here. *See, e.g., Ma v. Colvin*, No. 13-cv-05196-JST, 2014 WL 7184455, at *4 (N.D. Cal., Dec. 16, 2014) (finding no error where the ALJ failed to consider a particular listing, but the plaintiff failed to identify evidence to support that she medically equaled that listing). On this

22

1    issue, Ms. Doto's motion for summary judgment is denied, and the Commissioner's cross-motion

2    for summary judgment is granted.

3        Although portions of her briefing would seem to suggest it, the Court does not understand

4    Ms. Doto to contend that the ALJ should have considered lymphedema as a separate impairment

5    at step three of the sequential analysis.  While Dr. Herbst's 2015 records state that Ms. Doto has

6    lymphedema (AR 2250, 2255), the Commissioner disputes that Ms. Doto was diagnosed with

7    lymphedema, as opposed to lipedema, prior to her date last insured.  As noted above, Ms. Doto

8    argues that Dr. Eng diagnosed lymphedema, but points to only two pages from the records of

9    physical therapist Janet Smick.  While Ms. Smick indeed identified the referring provider as Dr.

10   Eng and noted that the "Referring Diagnosis" is "Congenital Lymphedema," (AR 519, 547), the

11   Court finds nothing in Dr. Eng's records reflecting that she made a diagnosis of lymphedema.  AR

12   456-459, 486-502, 509-512, 574-575, 582-586, 1939-1946, 1953, 1958-1963.  Instead, Dr. Eng's

13   reports refer to lipedema and state that her primary diagnosis was lipomatosis.  *See, e.g.,* AR 456,

14   458, 494, 499, 500, 501, 509, 510, 582, 584, 1958, 1960.

15       To the extent there are any differences or similarities between lymphedema, lipedema and

16   lipomatosis, the Court is in no position to make that determination on this record.  In any event,

17   Ms. Doto has not clearly articulated any argument that the ALJ should have considered

18   lymphedema as a separate impairment at step three of his analysis.  Indeed, it is exceedingly

19   difficult to tell exactly what Ms. Doto claims.  Her briefs are confusing, disorganized, and at times

20   incoherent.  As an example, in framing the issue as to what the ALJ failed to consider, Ms. Doto

21   refers to lymphedema and lipedema interchangeably.  Dkt. No. 20 at 5:11-6:6.  Accordingly, the

22   Court understands that Ms. Doto's arguments about lymphedema as a specific and distinct

23   condition are limited to her challenge to the Commissioner's failure to consider lymphedema in

24   connection with the Social Security Administration's compassionate allowance program.  The

25   Court now turns to those arguments.

26       **B.    Compassionate Allowance Program**

27       Ms. Doto argues that the ALJ was required, but failed, to consider that lymphedema is on

28   the Social Security Administration's list of compassionate allowances, as stated in a Social

23

Security Administration internal guidance, Program Operations Manual System ("POMS")

DI 23022.939. Under the compassionate allowance program, Ms. Doto argues that the

Commissioner is obliged "to provide benefits quickly to applicants whose medical conditions are

so serious that their condition obviously meets disability standards." Dkt. No. 20 at 8. Further,

she suggests that the compassionate allowance for lymphedema required the ALJ to credit

Kaiser's and Dr. Herbst's evidence as true. *Id.*

> According to the Social Security Administration's regulations:

> Compassionate allowance means a determination or decision we make under a process that identifies for expedited handling claims that involve impairments that invariably qualify under the Listing of Impairments in appendix 1 to subpart P based on minimal, but sufficient, objective medical evidence.

20 C.F.R. § 404.1602. There is little authority concerning the compassionate allowance program.

However, courts within the Ninth Circuit have concluded that the program primarily affects the

speed with which a claimant's application for Social Security benefits is processed, but does not

otherwise alter the standards for assessing disability. "Although there is an emphasis on quickly

determining claims for those 'most obviously disabled,' and although these individuals 'invariably

qualify,' such individuals still must be found to qualify pursuant to the Listings 'based on

minimal, but sufficient, objective medical information." *Jones v. Colvin*, No. 12-cv-05952-JRC,

2013 WL 6409877, at *3-4 (W.D. Wash., Dec. 9, 2013) (quoting 20 C.F.R. § 404.1602). *See also*

*Hall v. Colvin*, No. 1:12-CV-00347-REB, 2013 WL 4776463, at *4 (D. Idaho, Sept. 4, 2013)

("The fact that a condition is list[ed] as a compassionate allowance does not dictate a finding of

disability, rather it expedites process for evaluation."). Additionally, the Court may not reverse

the ALJ's findings based solely on non-compliance with the POMS, which "'does not impose

judicially enforceable duties on either this court or the ALJ." *Kennedy*, 738 F.3d at 1177 (quoting

*Carillo-Years v. Astrue*, 671 F.3d 731, 735 (9th Cir. 2011). Regardless, the POMS section that

Ms. Doto cites itself says that "[a]djudicators may, at their discretion, use the Medical Evidence of

Record or Listings suggested to evaluate the claim. *However, the decision to allow or deny the*

*claim rests with the adjudicator.*" POMS DI 23022.939 (emphasis added). Thus, insofar as Ms.

Doto argues that the compassionate allowance program mandates a finding of disability, the Court

1    finds no basis for that contention.  On this issue Ms. Doto's motion for summary judgment is

2    denied, and the Commissioner's cross-motion for summary judgment is granted.

3        **C.      Opinions of Treating Physicians, Non-Examining Physicians and Other Sources**

4

5        In determining that Ms. Doto has the RFC to perform her past work, the ALJ gave little

6    weight to the opinions of treating physicians Drs. Herbst and MacLean,[10] as well as physical

7    therapist Teri Burk,[11] that Ms. Doto was disabled or could not work during the period before her

8    insured status expired.  Instead, he gave significant weight to the opinions of Drs. Brodsky and

9    Nasrabadi, the two state agency physicians who reviewed Ms. Doto's medical records and

10   concluded that she had the RFC to perform sedentary work.  AR 18-19.  Ms. Doto argues that the

11   ALJ failed to provide sufficient reasons for discounting the opinions of her treating physicians and

12   physical therapist and erred in assigning greater weight to the opinions of the non-examining state

13   agency doctors.  The Commissioner maintains that the ALJ gave good reasons supported by

14   substantial evidence for his assessment of these opinions.

15       As relevant to the retrospective opinions at issue here, "reports containing observations

16   made after the period for disability are relevant to assess the claimant's disability," and medical

17   opinions should not be rejected solely because they are rendered retrospectively.  *Smith v. Bowen*,

18   849 F.2d 1222, 1225 (9th Cir. 1988).  An ALJ may nonetheless legitimately give less weight to

19   retrospective opinions that are conclusory or are unsupported by substantial evidence in the record.

20   *Johnson*, 60 F.3d at 1432-33.

21       **1.      Physical Therapist Teri Burk**

22       As discussed above, in a July 2015 report and RFC Questionnaire, Ms. Burk assessed Ms.

23   Doto with an RFC that that precluded her ability to work and further opined that the limitations

24   assessed in the questionnaire applied since 2011.  AR 2270-71, 2279-83.  Noting that Ms. Burk

25

26   [10] Although the headings to this portion of Ms. Doto's papers refer to a "Dr. Ang," presumably referring to endocrinologist Dr. Eng, the substance of the arguments she presents pertain only to the opinions of Drs. Herbst and MacLean.

27

28   [11] Ms. Doto's papers refer to an endocrinologist named Dr. Berg.  Based on the arguments presented, however, it appears that Ms. Doto actually is referring to physical therapist Teri Burk.

25

examined Ms. Doto for the first time in June 2015, the ALJ gave her opinion "little weight" because Ms. Burk is not an "acceptable medical source" and because she "provide[d] functional limitations (including limitations on lifting, manipulating, and neck movements) that are considerably more restrictive than the claimant herself describes." AR 19.

Only licensed physicians and certain other qualified specialists are considered "acceptable medical sources." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing 20 C.F.R. § 404.1513(a)). Physical therapists are defined as "other sources" and their evidence is not entitled to the same deference. 20 C.F.R. § 404.1527; SSR 06-03p. "The ALJ may discount testimony from these 'other sources' if the ALJ gives reasons germane to each witness for doing so." *Molina*, 674 F.3d at 1111 (quotations and citation omitted).

In discounting Ms. Burk's opinion, the ALJ properly could consider the brevity of the treatment relationship between Ms. Burk and Ms. Doto. Moreover, substantial evidence supports the ALJ's conclusion that Ms. Burk assessed greater functional limitations than Ms. Doto claimed. For example, Ms. Burk opined that Ms. Doto could use her hands for fine finger manipulations, at most, 10% of the time. AR 2282. In evaluating the medical evidence, however, the ALJ correctly noted that there are no reports of difficulty with Ms. Doto's use of her fingers. AR 16. While Ms. Burk opined that Ms. Doto can never do any lifting (AR 2281), Ms. Doto testified that she can lift her handbag, which she estimated is about five pounds (AR 53). The ALJ thus gave germane reasons for giving little weight to Ms. Burk's opinion. On this issue, Ms. Doto's motion for summary judgment is denied, and the Commissioner's cross-motion for summary judgment is granted.

## 2. Treating and Non-Examining Physicians

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Id*.

A treating physician's opinion is entitled to "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). "However, '[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.'" *Bray v. Comm'r of Social Security Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)).

When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must do two things. First, the ALJ must consider other factors, including "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(2)-(6)). Consideration must also be given to other factors, whether raised by the claimant or by others, or if known to the ALJ, including the amount of relevant evidence supporting the opinion and the quality of the explanation provided; the degree of understanding a physician has of the Commissioner's disability programs and their evidentiary requirements; and the degree of his or her familiarity with other information in the case record. 20 C.F.R. § 404.1527(c)(6); *Orn*, 495 F.3d at 631. The failure to consider these factors, by itself, constitutes reversible error. *Trevizo,* 871 F.3d at 676.

Second, the ALJ must provide reasons for rejecting or discounting the treating physician's opinion. The legal standard that applies to the ALJ's proffered reasons depends on whether or not the treating physician's opinion is contradicted by another physician. When a treating physician's opinion is not contradicted by another physician, the ALJ must provide "clear and convincing" reasons for rejecting or discounting the opinion, supported by substantial evidence. *Trevizo*, 871 F.3d at 675. When a treating physician's opinion is contradicted by another physician, an ALJ must provide "specific and legitimate reasons" for rejecting or discounting the treating physician's opinion, supported by substantial evidence. *Id.* "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quotations and citation omitted).

Dr. MacLean's and Dr. Herbst's opinions about Ms. Doto's inability to work are contradicted by the opinions of Drs. Brodsky and Nasrabadi, who both opined that Ms. Doto retained the functional capacity to perform sedentary work. AR 72-73, 85. Thus, the ALJ was required to provide "specific and legitimate" reasons for discounting Dr. MacLean's and Dr. Herbst's respective opinions, supported by substantial evidence. *Trevizo,* 871 F.3d at 675.

### a. Dr. MacLean

As discussed above, Ms. Doto saw Dr. MacLean in October 2011 to discuss her reduced mobility and her complaints of increased leg swelling and heaviness. AR 397. Dr. MacLean wrote a note for Ms. Doto to be "off work" from September 1, 2011 to March 1, 2012. *Id*. at 398-99. The ALJ noted that Dr. MacLean was Ms. Doto's treating physician, and he considered her treatment records from the time Ms. Doto began seeing her in January 2011 and throughout 2012. AR 17-18. He nonetheless gave little weight to Dr. MacLean's statement that Ms. Doto should be "off work" for six months, because "Dr. MacLean does not explain how she arrived at such a conclusion, which infringes upon the discretion of the Commissioner, and fails to provide specific functional limitations. In addition, her assessment is not supported by the above medical evidence." *Id.* at 18.

The ALJ's conclusion lacks the necessary analysis and interpretation of the record. Although the ALJ's decision indicates that he considered some of the factors under 20 C.F.R. § 404.1527(c), it is not clear that he considered all of them, or if he did, how and to what extent those factors led to his decision to give Dr. MacLean's opinion little weight. Moreover, he does not specifically relate any of the "above medical evidence" to his ultimate decision to give Dr. MacLean's opinion little weight. While the ALJ set out a summary of the facts, he failed to specify what evidence he believed conflicted with Dr. MacLean's opinion, his interpretation of it, and what findings led him to his ultimate conclusion as to the weight to give Dr. MacLean's opinion. While the Court "is not deprived of [its] faculties for drawing specific and legitimate inferences from the ALJ's opinion," the Court properly may do so only "if those inferences are

there to be drawn." *Magallanes*, 881 F.2d at 775. The Commissioner argues that the ALJ was entitled to give the non-examining agency physicians greater deference based on their expertise in Social Security disability evaluation, but nothing in the ALJ's decision indicates that that is what he did. The Court "reviews only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630.

The ALJ correctly observed that in the particular report in question, Dr. MacLean did not provide a specific assessment of Ms. Doto's functional limitations or explain how she concluded that Ms. Doto should not work for six months. However, while an ALJ is not obliged to accept opinions that are conclusory or inadequately supported by clinical findings, *Bray*, 554 F.3d at 1228, "[t]he primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations," *Orn*, 495 F.3d at 634. Thus, for example, the Ninth Circuit "do[es] not require that a medical condition be mentioned in every report to conclude that a physician's opinion is supported by the record," when the record, viewed in its entirety, provides ample support for the physician's opinion. *Orn*, 495 F.3d at 634. As discussed above, the ALJ did not sufficiently explain what evidence, in his view, does not support Dr. MacLean's opinion. Under the "substantial evidence" standard, "[t]he ALJ must do more than offer his conclusions. He must set forth his own interpretation and explain why they, rather than the doctors', are correct." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). Because the ALJ did not do so, and because it is unclear whether he considered all of the factors under 20 C.F.R. § 404.1527(c), the Court finds that he did not provide the requisite specific and legitimate reasons for giving little weight to Dr. MacLean's opinion.

On this issue, Ms. Doto's motion for summary judgment is granted, and the Commissioner's cross-motion for summary judgment is denied.

### b. Dr. Herbst

As discussed, Dr. Herbst saw Ms. Doto in April 2015 and wrote a report noting that Ms. Doto was unable to work for periods of time in 2010 and that on the LEFS measure of disability for the legs, Ms. Doto's score indicated that she was "severely disabled." AR 2238, 2243. In a July 2015 physical RFC questionnaire, Dr. Herbst opined that Ms. Doto was incapable of even

low-stress jobs and could not walk without severe pain due to diagnoses of "lipedema stage 3; hypermobile joint disorder, Lymphedema (stage 4 lipo-lymphedema)." Dr. Herbst stated that the limitations assessed in the questionnaire applied since 2010. AR 2250-54.

In assessing Dr. Herbst's opinion, the ALJ noted that she was Ms. Doto's treating endocrinologist who first saw Ms. Doto in June 2012, and he considered all of her treatment records, including those that post-dated the expiration of Ms. Doto's insured status. In discounting the weight given to Dr. Herbst's retrospective opinion as to the disabling severity of Ms. Doto's condition, the ALJ explained:

> Dr. Herbst, the treating endocrinologist, indicated: that the claimant's experience of pain or other symptoms were severe enough to interfere constantly with the attention and concentration needed to perform even simple work tasks; that she was incapable of even "low stress" jobs; and that she could not walk even one city block without rest or severe pain (Exhibit 25F/2). However, Dr. Herbst did not give exertional or postural limitations because she claimed she was "not trained" to do so (Exhibit 25F/2). The treating physician did note, in a questionnaire dated July 7, 2015, that the claimant's score of 8 out of 80, on a lower extremity functional scale, qualified her as "severely disabled" (although it is not clear when the test was administered) (Exhibit 25F/2; see Exhibit 24F/7). The treatment history and the description of the claimant's activities, as discussed in detail above, are not consistent with Dr. Herbst's findings. Therefore, her opinion is deserving of little weight.

AR 18-19.

As with Dr. MacLean, the ALJ's conclusion lacks the necessary analysis and interpretation of the record. Although the ALJ's decision indicates that he considered some of the factors under 20 C.F.R. § 404.1527(c), it is not clear that he considered all of them, or if he did, how and to what extent those factors led to his decision to give Dr. Herbt's opinion little weight. For example, it is unclear whether the ALJ gave proper consideration to Dr. Herbst's specialization about medical issues related to her area of specialty. 20 C.F.R. § 404.1527(c)(5). The ALJ discounted Dr. Herbst's opinion because she declined to fill out the exertional and postural portions of the RFC questionnaire, noting her stated lack of training to opine on such matters. In doing so, however, the ALJ failed to give sufficient reasons for rejecting the reported results of the LEFS test that Dr. Herbst felt qualified to administer as Ms. Doto's endocrinologist. The ALJ's view seems to be that because those test results were reported retrospectively, they need not be

1  credited. As discussed above, however, medical opinions should not be rejected solely because of

2  their retrospective nature. *Smith*, 849 F.2d at 1225.

3       As for Ms. Doto's treatment history, the ALJ does not specifically identify what

4  information from his summary of the medical evidence he found inconsistent with Dr. Herbst's

5  findings. Nevertheless, it may be inferred from the ALJ's decision that he found Dr. Herbst's

6  opinion inconsistent with Ms. Doto's "early relevant treatment history," which the ALJ noted

7  "does not reflect specific complaints related to lipedema." AR 16. However, Dr. Herbst noted

8  that lipedema is a congenital progressive disease "almost exclusively seen in women by the third

9  decade." AR 561. Ms. Doto testified that, although she did not know what was wrong and felt her

10  symptoms had been getting worse since 2006, she did not see a doctor to talk about her symptoms

11  very often, because she was always told it was obesity and that she needed to lose weight. *Id.* at

12  38. And, indeed, the record indicates that when she did tell a doctor about her leg problems in

13  2011, the doctor assessed severe obesity and suggested that Ms. Doto begin diet and exercise,

14  which Ms. Doto said had no effect on her arms or legs. *Id.* at 41-42, 296-297. The ALJ also

15  observed that Ms. Doto reported improvements in her condition by December 2012 and that Dr.

16  Herbst remarked that with continued treatment, Ms. Doto  would continue to feel better and notice

17  less fibrosis and heaviness in her legs. AR 18, 554. The record, however, does not reflect the

18  nature of the improvements or their degree or the baseline against which Dr. Herbst made the

19  comparison. Moreover, those observations are not inconsistent with Dr. Herbst's opinion, based

20  on her assessment of Ms. Doto's medical condition, that Ms. Doto was otherwise unable to work

21  since 2010 due to lipedema, hypermobility joint disorder, and obesity.

22       Finally, the ALJ concluded that Dr. Herbst's opinion was inconsistent with Ms. Doto's

23  daily activities. A treating physician's opinion may be rejected if it is inconsistent with a

24  claimant's daily activities, but this principle does not apply where "a holistic view of the record

25  does not reveal an inconsistency between the treating providers' opinions and [the claimant]'s

26  daily activities." *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014). Here, the ALJ noted

27  that treatment records in 2011 and 2012 show that Ms. Doto engaged in moderate to strenuous

28  exercise several days per week, ranging from forty to sixty minutes each time. AR 17-18.

However, the record as a whole indicates that Ms. Doto exercised in a pool, where she was able to move more easily in water. *See, e.g.,* AR 33, 35, 316, 334-35, 388, 397, 557. This evidence is not inconsistent with Dr. Herbst's assessment of Ms. Doto's functionality on land where the weight of her body was not supported by water. The ALJ also points to records indicating that Ms. Doto did yoga and took care of her injured husband. AR 17, 296. However, there are no details in the record as to what those activities involved, such that they can be deemed substantial evidence of an inconsistency with Dr. Herbst's opinion. *See, e.g., Trevizo*, 871 F.3d at 676 (concluding that the claimant's childcare responsibilities were not substantial evidence inconsistent with her treating physician's opinion where there was a lack of detail about what was involved in performing those activities). The ALJ further noted that in December 2010, Ms. Doto was going on a Disney vacation in 10 days and that she attended a birthday party in May 2011. AR 17. Because the record contains no details regarding what those activities involved, these activities also are not substantial evidence inconsistent with Dr. Herbst's opinion. Moreover, courts "have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick*, 157 F.3d at 722; *see also Cooper v. Brown*, 815 F.2d 557, 561 (9th Cir. 1987) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." (quotation omitted)).

For these reasons, and because it is unclear whether the ALJ considered all of the factors under 20 C.F.R. § 404.1527(c), the Court finds that he did not provide the requisite specific and legitimate reasons for giving little weight to Dr. Herbt's opinion.

On this issue, Ms. Doto's motion for summary judgment is granted, and the Commissioner's cross-motion for summary judgment is denied.

### D.     The ALJ's Assessment of Ms. Doto's Obesity

Ms. Doto argues that in determining that she could perform her past relevant work at step four of the sequential analysis,[12] the ALJ failed to address her obesity in his RFC analysis as required by Social Security Ruling 02-1p. The Court agrees.

---

[12] Ms. Doto refers in her arguments to step five of the sequential analysis. However, since the ALJ concluded that Ms. Doto could perform her past relevant work, he did not reach step five.

"While obesity is no longer listed among the Listing of Impairments, it is still classified as a medically determinable impairment that must be considered in disability assessments." *Browning v. Colvin*, 228 F. Supp. 3d 932, 942 (N.D. Cal. 2017) (citing SSR 02-1p, 2002 WL 34686281). "According to the Social Security Rules, in evaluating obesity to determine a claimant's RFC, the ALJ's assessment 'must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.'" *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) (quoting SSR 02-1p). "As with other impairments, the ALJ should explain how he determined whether obesity caused any physical or mental impairments." *Id*. Further, Social Security Ruling 96-8p provides, in relevant part:

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.

SSR 96-8p, 1996 WL 374184.

In *Celaya v. Halter*, 332 F.3d 1177 (9th Cir. 2003), the ALJ erred at step three of the sequential analysis in failing to consider obesity as a disabling factor, even though obesity was not specifically raised by the claimant, because (1) obesity was implicitly raised in the claimant's report of symptoms, (2) the claimant's obesity was at least close to the listing criterion and was a condition that could exacerbate other impairments, and (3) the claimant's lack of legal representation should have alerted the ALJ to the need to develop the record further. *Id*. at 182. In *Burch*, on the other hand, an ALJ's failure to consider obesity at step two of the sequential analysis was found to be harmless error because (1) there was no evidence that obesity exacerbated the claimant's other impairments, and (2) the ALJ expressly considered the claimant's obesity at step five and concluded that, while obesity likely contributed to the claimant's back discomfort, it did not impair her ability to work. *Burch*, 400 F.3d at 683.

Here, unlike *Burch*, the record indicates that Ms. Doto's obesity limits her functioning. Indeed, state agency physician Dr. Brodsky noted that the "potential impact of hyperobesity on performance is significant [with respect] to weight bearing, cardiac, and respiratory systems."

33

AR 69.  However, unlike *Celaya*, the ALJ did not wholly ignore Ms. Doto's obesity.  Indeed, he found obesity to be a severe impairment, and he said he considered Ms. Doto's obesity in combination with her other impairments and its impact on her ability to work.  AR 18.  The Commissioner argues that the ALJ properly evaluated Ms. Doto's obesity by relying on the state agency physicians' opinions for his RFC assessment.  For the reasons discussed above, however, the Court finds that the ALJ did not properly assess the medical opinions of record.  Moreover, the ALJ did not explain how he analyzed Ms. Doto's obesity in combination with her other impairments.

Because the record indicates that Ms. Doto's obesity had a significant impact on her functioning, the ALJ's analysis is insufficient.  On this issue, plaintiff's motion for summary judgment is granted, and the Commissioner's cross-motion is denied.

### E.      The ALJ's Assessment of Ms. Doto's Pain Allegations

Finally, Ms. Doto argues that, in concluding that she could perform her past relevant work, the ALJ failed to consider her pain allegations.  The record indicates that the ALJ did consider Ms. Doto's pain allegations (AR 16-18), but found that her allegations regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible (AR 19).

An ALJ conducts a two-step analysis in assessing subjective testimony.  First, "the claimant 'must produce objective medical evidence of an underlying impairment' or impairments that could reasonably be expected to produce some degree of symptom." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996)).  If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony as to the severity of the symptoms "'only by offering specific, clear and convincing reasons for doing so.'" *Id*. (quoting *Smolen*, 80 F.3d at 1283-84).  That is, the ALJ must "make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002)).  "This is not an easy requirement to meet:  The clear and convincing standard is the most demanding required in Social Security cases." *Trevizo*, 871 F.3d at 678 (quotations and citation omitted).

An ALJ may consider several factors, including (1) ordinary techniques of credibility evaluation; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. *Tommasetti*, 533 F.3d at 1039. Additionally, an ALJ may also consider the observations of treating and examining physicians and other third parties concerning the nature, onset, duration, and frequency of the claimant's symptoms; precipitating and aggravating factors; and functional restrictions caused by the symptoms. *Smolen*, 80 F.3d at 1284. "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." *Burch*, 400 F.3d at 681. "If the ALJ's finding is supported by substantial evidence, the court 'may not engage in second-guessing.'" *Tommasetti*, 533 F.3d at 1039 (quoting *Thomas*, 278 F.3d at 959).

Here, the ALJ found that Ms. Doto's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but concluded that her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible. . . ." AR 19. The ALJ made no finding of malingering and therefore was required to provide specific, clear and convincing reasons for discounting Ms. Doto's statements regarding her symptoms. *Tommasetti*, 533 F.3d at 1039. The ALJ explained:

> The claimant's allegation of generally disabling symptoms and limitations are not corroborated by the evidence in the record, as discussed above. In addition, the record shows that the claimant: is the primary caregiver for her paraplegic husband; provides care for her young daughter; does "very part-time work for the family business"; does yoga; performs three days of moderate to strenuous exercise for, on average, forty to sixty minutes per day; goes shopping; and attended a birthday party (Exhibits 1F/33, 35, 56, 73; 2F/37, 52; 3F/70; 4F/7; 5F/12, 94, 95). These activities are not inconsistent with residual functional capacity described above. They are, however, inconsistent with allegations of disability because they suggest that the claimant is capable of performing appropriate work activities on an ongoing and daily basis.
>
> It is also noted that the claimant also failed to keep several medical appointments, including physical therapy sessions and visits with dieticians (Exhibits 1F/43, 45, 53; 2F/43; 3F/89).

AR 19. Additionally, the ALJ noted that during her February 2013 hospitalization for her pulmonary embolism, a nurse observed during one particular shift that Ms. Doto was "[v]ery

independent" with her activities of daily living. *Id.* at 19, 672.

If, despite claims of pain, "a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). At the same time, the "Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits," and "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Id.* And merely because a disability plaintiff carries on certain daily activities "does not in any way detract from her credibility as to her overall disability." *Orn*, 495 F.3d at 639 (citation omitted). Thus, "[t]he ALJ must make 'specific findings relating to [the daily] activities' and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination." *Id.* (quoting *Burch*, 400 F.3d at 681).

In the present case, there are no details in the record as to what was required for Ms. Doto to care for her husband and child, or what she did in her "very part-time work for the family business" (AR 666). As discussed above, the record as whole indicates that Ms. Doto engaged in exercise in the water, where the weight of her body was supported. The record does not indicate that she engaged in equally vigorous exercise on land. Nor is there an explanation or evidence to support that any of the identified activities are transferable to a work setting or that Ms. Doto spent a substantial part of her day engaged in transferable skills. *Orn*, 495 F.3d at 639; *Fair*, 885 F.2d at 603. Accordingly, the mere fact that Ms. Doto carried on these activities does not constitute substantial evidence to support the ALJ's decision to discount Ms. Doto's statements as to the severity of her symptoms.

In noting her missed medical appointments, the ALJ also partially discounted Ms. Doto's symptom reporting based on "an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603. "While there are any number of good reasons for not doing so, a claimant's failure to assert one, or a finding by the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain

36

testimony." *Id.* (citations omitted). Here, the ALJ correctly noted that Ms. Doto missed several medical appointments, including two visits to dieticians and two physical therapy sessions. AR 19, 304, 306, 314, 394, 539. The record is not further developed on this point. However, the record does reflect that, despite the two missed physical therapy appointments, Ms. Doto continued with her recommended home exercise program. AR 306. Ms. Doto did miss two nutritional appointments, and the Commissioner also points out that Dr. Herbst's December 2012 report notes that Ms. Doto had made changes in her life and noticed a lot of improvement. AR 18, 304, 314, 554. As discussed above, however, the record does not reflect the nature of the improvements or their degree or the baseline against which Dr. Herbst made the comparison. Viewing the record as whole, the Court concludes that the ALJ did not provide clear and convincing reasons, supported by substantial evidence, that satisfy the demanding standard for discounting Ms. Doto's statements as to the severity of her symptoms.

On this issue, Ms. Doto's motion for summary judgment is granted, and the Commissioner's cross-motion is denied.

## V. DISPOSITION

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). That is because "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the testimony as true." *Treichler*, 775 F.3d at 1106. Under the credit-as-true rule, the Court may order an immediate award of benefits only if three conditions are met. First, the Court asks "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014)). Next, the Court "determine[s] 'whether there are outstanding issues that must be resolved before a determination of disability can be made . . . . and whether further administrative proceedings would be useful.'" *Id.* (quoting *Treichler*, 775 F.3d at 1101). "When these first two conditions are satisfied, [the Court] then credit[s] the discredited

testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability." *Id.* (citing *Treichler*, 775 F.3d at 1101). Even when all three conditions are satisfied and the evidence in question is credited as true, it is within the district court's discretion whether to make a direct award of benefits or to remand for further proceedings when the record as a whole creates serious doubt as to disability. *Id.* at 1045. As explained by the Ninth Circuit, "[a]n automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule." *Id.* at 1044.

In the present case, the first condition is met because the Court has found that the ALJ failed to provide legally sufficient reasons for giving little weight to the opinions of Drs. MacLean and Herbst and for discounting Ms. Doto's reports of her symptoms. However, because the ALJ did not fully or properly evaluate the opinions of Drs. MacLean and Herbst, or properly consider Ms. Doto's symptom reports, there remain outstanding issues to be resolved, including the ALJ's determinations regarding Ms. Doto's RFC and her ability to work. *See, e.g., Salaz v. Colvin*, 650 Fed. App'x 926 (9th Cir. 2016) (vacating the ALJ's RFC determination and remanding for further proceedings where the ALJ failed to give legally sufficient reasons for rejecting aspects of the claimant's treating physicians' opinions and for finding the claimant not fully credible); *Asmar v. Colvin*, No. 16-cv-01079-GPC-MDD, 2017 WL 3405688, at *11 (S.D. Cal., Aug. 9, 2017) (remanding for further proceedings where the ALJ did not properly assess the treating physicians' opinions and, thus, issues concerning the plaintiff's RFC and ability to work remained in the case); *Murphy v. Colvin*, No. 14-cv-03784-YGR, 2015 WL 6674815, at *13-14 (N.D. Cal., Nov. 2, 2015) (same). Accordingly, the Court will remand this matter for further proceedings.

## VI.    CONCLUSION

Based on the foregoing, Ms. Doto's motion for summary judgment is granted in part and denied in part, the Commissioner's cross-motion for summary judgment is granted in part and denied in part, and this matter is remanded for further proceedings consistent with this order. The

Clerk shall enter judgment accordingly and close this file.

   **IT IS SO ORDERED.**

Dated:   September 28, 2018

VIRGINIA K. DEMARCHI
United States Magistrate Judge